# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### 1:18-cv-00461

| | | |
|---|---|---|
| **MICHAEL SHAUGHNESSY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **COMPLAINT** |
| **v.** | ) | |
| | ) | |
| **DUKE UNIVERSITY, PRIVATE** | ) | |
| **DIAGNOSTIC CLINIC, PLLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| | ) | |

## PRELIMINARY STATEMENT

Dr. Michael Shaughnessy was an exemplary physician and anesthesiologist at Duke University whose seven-year career at Duke was cut short in retaliation and discrimination against his complaints about disability and sex discrimination in Duke's Anesthesiology Department. Dr. Shaughnessy consistently earned high performance ratings and professional accolades throughout his years at Duke. However, in mid- to late 2016, following the tragic suicide of a resident physician within Duke's Anesthesiology Department, Dr. Shaughnessy and others complained about the insensitive response and stubborn refusal to support those with mental health disabilities, and, additionally, the sex discrimination leveled against many female physicians in the Anesthesiology Department by its Chair, Dr. Joseph Mathew, and other members of the faculty management, including Vice Chair Dr. Gavin Martin. Moreover, following Duke's decision to end Dr. Shaughnessy's employment, Duke blocked his employment with other

1

healthcare institutions and hospitals including UNC, the Durham VA, and Duke Regional Hospital. This is a civil rights lawsuit seeking both compensatory and punitive damages, *inter alia*, for the willful discrimination and retaliation perpetrated by Defendants in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, the ADA Amendments Act of 2008 ("ADAAA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-3, and against the Defendants under the common law of the State of North Carolina.

## THE PARTIES

1. At all times relevant to this Complaint, Plaintiff Michael Shaughnessy, M.D., has been a citizen and resident of Wake County, North Carolina. Dr. Shaughnessy was an "employee" of Defendant within the meaning of the common law and within the definition of the ADA, 42 U.S.C. § 12112, *et seq*. At all times relevant to this Complaint, Dr. Shaughnessy was a person with a disability under the ADA and ADAAA.

2. At all times relevant to this Complaint, Defendant Duke University ("Duke") has been a non-profit corporation organized and existing under the laws of the State of North Carolina with its principal place of business at 310 Blackwell Street, Fourth Floor, Durham, North Carolina 27701. At all times relevant to this Complaint, Duke did business in the State of North Carolina and was the employer of Dr. Shaughnessy within the meaning of the common law of the State of North Carolina and in accord with the definition of "employer" under the ADA. At all times relevant to this Complaint, Duke regularly employed more than 500 employees.

3. At all times relevant to this Complaint, Defendant Private Diagnostic Clinic, PLLC ("PDC"), has been a professional limited liability company organized and existing under the laws of the State of North Carolina with its registered office on Trent Drive in Durham, North Carolina 27710. At all times relevant to this Complaint, PDC did business in the State of North

2

Carolina and was the employer of Dr. Shaughnessy within the meaning of the common law of the State of North Carolina, and in accord with the definition of "employer" under the ADA. At all times relevant to this Complaint, PDC regularly employed more than 500 employees. PDC is a company affiliated with Duke and controlled by Duke. Hereinafter, references to "Duke" shall encompass both Duke and PDC unless otherwise specified.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as certain of Dr. Shaughnessy's causes of action arise under the laws of the United States. This Court has supplemental jurisdiction over the subject matter of Dr. Shaughnessy's claims arising under the laws of the State of North Carolina pursuant to 28 U.S.C. § 1367 as such claims form the same case or controversy as those claims arising under the laws of the United States.

5. Venue is proper in the United States District Court for the Middle District of North Carolina under 28 U.S.C. § 1391(b)(1) and (b)(2), inasmuch as Duke resides within this judicial district and a substantial part of the events or omissions giving rise to the following claims occurred within this judicial district.

## FACTS

6. Dr. Shaughnessy is an anesthesiologist and physician licensed to practice medicine in the State of North Carolina. Dr. Shaughnessy holds an undergraduate degree from Princeton University and earned his medical degree from Duke University Medical School in 2006. Dr. Shaughnessy performed his residency in Anesthesiology at Massachusetts General Hospital until 2010. Dr. Shaughnessy obtained fellowship training at Duke, serving as a faculty fellow in Regional and Ambulatory Anesthesiology from 2010-2011. Dr. Shaughnessy has long-

3

standing ties to Duke: he was born in Duke University Hospital, grew up in Durham, North Carolina, on and around Duke's campus, and his father remains a tenured full professor at Duke.

7. On or about August 1, 2011, Dr. Shaughnessy was hired into a regular rank faculty position in the Department of Anesthesiology at Duke (hereinafter "the Department") and was appointed as Assistant Professor. As such, Dr. Shaughnessy entered into a contract with PDC to work clinically as a physician at Duke Hospital.

8. Throughout Dr. Shaughnessy's employment with Duke, he worked on annual contracts that were continually renewed until the Chair improperly ended his contact in January 2017.

9. Throughout Dr. Shaughnessy's employment with PDC, he worked as an at-will employee of the same until his wrongful termination on or about June 30, 2017.

10. Throughout his employment with Duke, Dr. Shaughnessy maintained an exemplary record of performance in his provision of care to patients and developed an excellent relationship with medical students, residents, fellows, CRNA's, attending surgeons and consultants, nurses, anesthesia technicians and all manner of staff within Duke University Hospital.

11. In early 2017, Dr. Shaughnessy was nominated by formal letter by at least five of his faculty peers, including four attending surgeons and an attending anesthesiologist in his Department, to receive a professionalism award by the Duke School of Medicine for his actions as a physician and member of the Duke medical community. These letters detailed Dr. Shaughnessy's tireless patient advocacy as well as his excellent clinical skills and rapport with his colleagues. Moreover, upon information and belief, one or more letters detailed Dr. Shaughnessy's commitment to, and exemplary teaching of, numerous 18-Delta Special Forces Medics rotating through Duke as part of their Medical Proficiency Training (MPT) in support

4

of the United States Armed Forces' efforts to improve battlefield medicine. As a result of the strength of these nominations, Dr. Shaughnessy was recognized by the Dean of Faculty as a "Distinguished Nominee" in the program of the 2017 Duke Annual Spring Faculty Meeting.

12.     Moreover, on or about March 9, 2017, Dr. Shaughnessy was elected by secret ballot to serve a two-year term as a member of Duke's Academic Council at Duke. Dr. Shaughnessy received numerous votes from Duke faculty colleagues across Duke Medical Center to obtain this position. The Academic Council is a prestigious body and the chief instrument of faculty governance at Duke.

13.     Dr. Shaughnessy received raises in each of the six years he worked at Duke along with elevated levels of responsibility. Up until December 2016, Dr. Shaughnessy's performance had been semi-annually rewarded by the payment of substantial profit-sharing bonuses (known as "gain share") distributed to him through PDC.

14.     During Dr. Shaughnessy's employment with Duke, he spent approximately 80 percent of his working time attending to clinical responsibilities and devoted the remaining 20 percent of his time to research, training, and education of medical students and residents.

15.     At all times relevant to this Complaint, Dr. Shaughnessy has been a person with a disability. Namely, Dr. Shaughnessy has suffered from a congenital complete heart block that has required the implantation of a permanent cardiac pacemaker to treat the same disability. In addition, Dr. Shaughnessy has had a history of major depression as well as rosacea (causing a reddening of the skin). Dr. Shaughnessy has received intensive Cognitive Behavioral Therapy (CBT)-based counseling and medication to treat his depression.  Dr. Shaughnessy's rosacea has required specialized medication management and laser treatments to control symptoms. He has received all of his medical care for these conditions at Duke.

5

16.     When he began his faculty position, Dr. Shaughnessy requested an accommodation for his congenital heart block from Duke. This became of specific importance in 2013 with the opening of new operating rooms (hereinafter "OR") containing MRI scanners. Dr. Shaughnessy reinforced written notification of this accommodation numerous times between 2013 and 2014. Specifically, then-Vice Chair Dr. Holly Muir and Dr. Gavin Martin granted Dr. Shaughnessy's request not to work on cases involving the use of Magnetic Residence Imaging (MRI) machinery both in the OR and offsite due to the potential that machine has to interfere with the normal operation of his pacemaker which would be life-threatening to him.

17.     During Dr. Shaughnessy's employment with Duke, the Chair of the Department, Dr. Joseph Mathew (male, no known disability) (hereinafter "Chair Mathew"), in addition to other members of the Department's leadership including Division Chief Dr. Jeffrey Gadsden (male, no known disability), and Vice Chair Dr. Gavin Martin (male, no known disability), were aware of Dr. Shaughnessy's disability, his history of disability, and its treatment. Dr. Shaughnessy was regarded by the foregoing as having a disability.

18.     During Dr. Shaughnessy's employment, following Chair Mathew's accession to the role of interim Chair of the Department in 2014, Dr. Shaughnessy observed Chair Mathew's repeated harassment and discrimination against women and people with disabilities.

19.     For example, Chair Mathew discriminated and retaliated against a member of the Department, Dr. Cheryl Jones. Dr. Jones was an outspoken advocate for the rights of women and the disabled and was herself a person with a disability. Namely, Dr. Jones suffered from depression. In September 2015, a female employee was assaulted by a male at Duke University Hospital and found beaten and unconscious in a bathroom. Chair Mathew downplayed the incident because he believed that because the woman was not sexually assaulted, the incident

6

was not serious. Female members of the Hospital staff, including Dr. Jones, wrote emails to Chair Mathew about the need to make female employees of the Hospital aware of the assault because the assailant had not been captured.  Upon information and belief, Chair Mathew reprimanded Dr. Jones for participating in a warning to female employees about the assault. After this incident, Chair Mathew stripped Dr. Jones of her administrative assistant, Bridgette White. Less than a year later after this incident, Dr. Jones would be forced out of Duke by Chair Mathew.

20.     Moreover, numerous other female physicians have experienced hostile and harassing behaviors from Chair Mathew and have been pushed out of their positions at Duke by the same.

21.     In May or June 2016, a female anesthesiology resident at Duke who had a disability committed suicide (hereinafter "the Resident"). The Resident had been exhibiting symptoms of depression during her stressful second year of residency.

22.     Following the Resident's tragic death, Duke faculty were greatly shaken and upset. Chair Mathew called a faculty meeting to discuss his position that Duke had done nothing wrong in the events leading up to the Resident's death. Dr. Jones complained in that meeting that Duke was being insensitive by focusing on its own liability for the Resident's death rather than critically assessing how it can prevent future tragedies stemming from depression. Dr. Jones advocated for talking with others who may be exhibiting signs of depression and related her own experience with depression. Dr. Jones said that as a Department, Duke had failed in its obligation to offer help to the Resident. Chair Mathew warned the faculty in this meeting that they should not discuss these events at all because of his concern about the Department's legal liability. Chair Mathew appeared very angry at Dr. Jones' comments.

7

23.     Thereafter, Dr. Jones got together with a group of residents in order to offer support in the aftermath of the Resident's suicide. When Chair Mathew learned of this, he held another faculty meeting and declared that the Department's faculty were not permitted to gather with residents without the approval of the Residency Program Director. Dr. Jones was also prohibited from organizing a candlelight vigil to mourn the Resident's death.

24.     After Dr. Jones was blocked from organizing a candlelight vigil, she purchased a series of books entitled Physician Suicide Letters Answered, written by the renowned physician and scholar, Pamela Wible, M.D.  Dr. Jones attempted to charge this purchase to her faculty discretionary spending account (hereinafter "FDA Account") provided to her by Duke. However, she was denied the use of the account to pay for the books. She had never before been denied use of her discretionary account. Nonetheless, Dr. Jones purchased these books with her own funds and placed them on a shelf in the Obstetric Anesthesia work room.

25.     Upon information and belief, acting upon the orders of Chair Mathew, Executive Vice Chair Dr. Sol Aronson, and Division Chief Ashraf Habib met with Dr. Jones in Dr. Habib's office and told her that she was not allowed to distribute the books to residents. In that meeting, Dr. Aronson harangued Dr. Jones for placing the books in the Obstetric Anesthesia work room and as Dr. Jones attempted to leave the office, Dr. Aronson positioned himself in the doorway and physically blocked Dr. Jones from leaving.

26.     Following this incident, Dr. Jones sent an email to the entire Department relating what had occurred with the books and Dr. Aronson's aggressive behavior in detaining her in Dr. Habib's office against her will.

27.     Dr. Shaughnessy read the email from Dr. Jones and became very concerned by the apparent mistreatment of Dr. Jones and the discriminatory behavior evidenced by Duke against

8

those with a disability. On or about early August 2016, Dr. Shaughnessy met individually with former Vice Chair and Division Chief Dr. Richard Moon, then-Division Chief for General/Vascular/Transplant Dr. Tim Miller, and then-Division Chief Gavin Martin. Dr. Shaughnessy stated to each of these individuals that based upon the email from Dr. Jones, what he had witnessed from Chair Mathew in the faculty meeting following the Resident's death, Dr. Jones' complaints in that same meeting, and the aggressive and hostile response to her attempts to provide literature that may be helpful to those suffering from depression, Dr. Shaughnessy had serious concerns about Duke's mistreatment of Dr. Jones and hostility towards those suffering from depression. During the conversations with those three individuals, Dr. Shaughnessy referenced his own struggle with depression and requested that Drs. Moon, Miller and Martin relay and echo his concerns to Chair Mathew about Dr. Jones' mistreatment and encouraged them as mentors and administrators to likewise complain about the overall response to the Resident's suicide stemming from her disability. Upon information and belief, on or about early August 2016, Dr. Miller and Dr. Moon, complained to Chair Mathew about the foregoing events.

28.     A few weeks later, in August 2016, Dr. Jones went out on disability leave and then subsequently ended her employment with Duke by resignation. Upon information and belief, the harassment and retaliation she had received from Chair Mathew and Dr. Aronson caused her to feel compelled to resign her faculty position while on leave on or about October 2016.

29.     On or about October 19, 2016, Chair Mathew then called a meeting with Dr. Shaughnessy's division in order to discuss "recent departmental events", such as the Resident's suicide, the email sent by Dr. Jones, and the events leading to Dr. Jones' resignation. Chair Mathew announced that he wished to have this meeting ahead of resident

9

application season so that everyone was "on the same page" regarding how to behave towards resident applicants. In this meeting, Chair Mathew expressed his disdain for Dr. Jones and her disability and attributed her actions to mental illness. Chair Mathew then instructed those present to inform applicants for the residence program that the Resident had committed suicide because she had a drug problem. Chair Mathew did not want any discussion about the Resident's depression.

30.     In this meeting, Dr. Shaughnessy objected to Chair Mathew's instruction to characterize the Resident's death as attributable to drugs. Dr. Shaughnessy stated that the Resident clearly had a disability and to besmirch her death by saying it was attributable to drugs was inappropriate. Dr. Shaughnessy then referenced his own struggle with depression. Dr. Shaughnessy asked Chair Mathew whether there would be consequences for Dr. Aronson's threatening behavior towards Dr. Jones when he met with her to discuss the books in Dr. Habib's office. Chair Mathew responded that despite exercising poor judgement in that meeting, Dr. Aronson was a very important member of the Department and accordingly would not be reprimanded and that Dr. Aronson was considering suing Dr. Jones for her statements.

31.     Dr. Shaughnessy stated to Chair Mathew that Dr. Jones was a valuable member of Duke's faculty and the Department needed to accommodate Dr. Jones and help her work through her disability. Chair Mathew stated that Dr. Jones has a mental illness. Dr. Shaughnessy responded that the Department should explore how to find a way for Dr. Jones to return from her medical leave by determining whether accommodations are available. Chair Mathew snapped at Dr. Shaughnessy, stating, "She will never want to come back." Chair Mathew appeared angry at him for voicing his complaints about Dr. Jones.

32.     Shortly following the October 19, 2016 meeting, Chair Mathew confronted Dr.

Shaughnessy and said that he believed Dr. Shaughnessy was not happy with his presentations and about the instructions he had given. Dr. Shaughnessy complained to Chair Mathew about his treatment of Dr. Jones. Chair Mathew responded dismissively that Cheryl Jones was simply wrong and she should have known better than to act the way she did.

33. A few weeks later, in late October or early November 2016, Vice Chair Martin confronted Dr. Shaughnessy and threatened him, warning that he should not, "rile up the troops," and telling Dr. Shaughnessy that he seemed unhappy. Vice Chair Martin warned that Chair Mathew might see to it that Dr. Shaughnessy's contract might not be renewed.

34. During this time period, with prior permission from then-Vice Chair Dr. Holly Muir and then-Division Chief Martin obtained on or around August 29, 2016, Dr. Shaughnessy had been seeking an internal practice transition to Regional Anesthesia, PLLC ("Regional Anesthesia"), which is a part of Duke Regional Hospital. Regional Anesthesia holds a contract with Duke to perform anesthesia services at Duke Regional Hospital in addition to other Duke-affiliated and unaffiliated locations in the Triangle area. Physicians at Regional Anesthesia have identical, continuing appointments on the Duke faculty and there is a close relationship between Regional Anesthesia and Duke. In fact, Regional Anesthesia is considered the Community Division of the Department with Dr. Eddie Sanders as the Division Chief. Upon information and belief, Regional Anesthesia is also wholly owned by the PDC.

35. At all times relevant to this Complaint, Chair Mathew had veto power over the hiring of doctors at Regional Anesthesia as well as power over faculty appointments.

36. On or about November 18, 2016, Dr. Shaughnessy was called into a meeting with Vice Chair Martin and newly-designated Division Chief Gadsden to discuss Dr. Shaughnessy's transition to Regional Anesthesia. At this meeting, Vice Chair Martin informed Dr.

11

Shaughnessy that he was an "outstanding anesthesiologist" and that "[Dr. Shaughnessy] [was] very bright" and thus could "read between the lines." Dr. Shaughnessy was then admonished that he should not be outspoken against Chair Mathew with regards to Dr. Jones, Chair Mathew's directives regarding communications to the resident applicants about the Resident, or any other matter. Dr. Shaughnessy was told that Chair Mathew was very upset with him.

37.     Moreover, in this meeting, Dr. Shaughnessy was informed by Vice Chair Martin that, in response to Dr. Shaughnessy's email inquiry about compensation and benefits during the transition to Regional Anesthesia, Chair Mathew had decided he would refuse to provide Dr. Shaughnessy with the gain share.  Upon information and belief, Chair Mathew's refusal to provide the gain share was due to his displeasure with Dr. Shaughnessy's recent complaints. Vice Chair Martin also informed Dr. Shaughnessy that Chair Mathew had stipulated that he would have to resign his faculty appointment in order to make the transition.  Dr. Shaughnessy complained to Vice Chair Martin and Division Chief Gadsden that these requirements were unnecessary, not based on any established policy at Duke, and unfair to Dr. Shaughnessy.

38.     Dr. Shaughnessy was then told by Vice Chair Martin that if he caused further issues for the Department, Dr. Shaughnessy could count on sabotaged letters of reference, punishment through a diminution in his gain share to be paid in December 2016, and blacklisting at Duke Regional as well as at the University of North Carolina (UNC) or the Durham Veteran's Affairs Medical Center (hereinafter "the VA"). Vice Chair Martin warned how "small of a world" the anesthesiology business is in this area. Dr. Shaughnessy responded that he was deeply concerned by these statements and that he felt they were directly retaliatory for speaking up in the divisional meeting on October 19, 2016.

39.     On or about December 9, 2016, Dr. Shaughnessy had a telephone conversation with

Division Chief Gadsden in which Dr. Shaughnessy requested fair treatment from him. Division Chief Gadsden had recently attained the position of Division Chief and, because Division Chief Gadsden been away at the October 19, 2016 meeting and had remained largely silent during the November 18, 2016 meeting, Dr. Shaughnessy informed Division Chief Gadsden of the comments and specific objections he had made to Chair Mathew about Chair Mathew's offensive characterizations of the Resident and Dr. Jones, as well as Dr. Aronson's behavior toward Dr. Jones. Division Chief Gadsden expressed that he held similar concerns about Chair Mathew and Dr. Aronson, reminding Dr. Shaughnessy that, "Joe isn't the Chair I came to work for" and that allowing Dr. Aronson to meet with Dr. Jones like that was akin to "putting a bull in a china shop." Division Chief Gadsden expressed his agreement with Dr. Shaughnessy's points about the Resident and Dr. Jones, but warned him that Chair Mathew seemed "out to get him" and to "be careful." The following evening, on December 10, 2016, Dr. Shaughnessy attended the Divisional Holiday Party at Division Chief Gadsden's residence. At that party, Division Chief Gadsden warmly welcomed Dr. Shaughnessy, but later privately told him to "watch your back, I think they are coming after you for what you said."

40.     On or about January 6, 2017, Dr. Shaughnessy was called into a meeting with Chair Mathew, Vice Chair Martin, and Division Chief Gadsden. In this meeting, Dr. Shaughnessy was informed that his contract with Duke would not be renewed and they were providing the 180 days' notice required under the terms of the faculty handbook. Chair Mathew stated that Dr. Shaughnessy was "not a good fit" and that if Dr. Shaughnessy forced the Department to provide the underlying reasons for his discharge, then Chair Mathew would not support Dr. Shaughnessy's candidacy for a position at Duke Regional. Chair Mathew conceded that Dr. Shaughnessy was a great clinician.

13

41.    Chair Matthew and Vice Chair Martin also informed Dr. Shaughnessy that they may permit him to seek employment at UNC, but they did not have to do that, indicating that they would not allow Dr. Shaughnessy to obtain a job at UNC unless he remained silent about the decision not to renew his contract.

42.    In this meeting, Vice Chair Martin told Dr. Shaughnessy that there was "no cause" for the decision to not renew Dr. Shaughnessy and alleged that there does not have to be a reason to decide not to renew his contract.

43.    Dr. Shaughnessy was shocked by this abrupt decision and requested additional information about the reasons for his discharge. Chair Mathew elaborated and stated that Dr. Shaughnessy was "often unhappy" during his "presentation" and "interactions" with Chair Mathew.

44.    Chair Mathew also stated that he had heard primarily from Vice Chair Martin that Dr. Shaughnessy was guilty of a "lack of professionalism" and was "not a good fit." Chair Mathew repeated that Dr. Shaughnessy "seemed unhappy to them", and that he was reluctant or unable to do certain cases, referring to the accommodations offered to Dr. Shaughnessy regarding MRI cases.  Chair Mathew stated that the feedback he received from Vice Chair Martin encouraged him to make the decision to not renew Dr. Shaughnessy's contract.

45.    Chair Mathew then addressed Dr. Shaughnessy's disability, stating that he knew Dr. Shaughnessy had gone through "trials" in his life. Chair Mathew referenced the Resident's suicide as having been a significant event to Dr. Shaughnessy.

46.    Chair Mathew then told Dr. Shaughnessy that he had seriously considered the decision to fire him and compared the situation to that of Dr. Jones being forced out of the Department. Referring to Dr. Jones' situation, Chair Mathew stated that it was not as if he decided one day

14

that, "We need to get rid of Cheryl."

47.     Chair Mathew and Dr. Shaughnessy then discussed Dr. Shaughnessy's transition to Regional Anesthesia. Chair Mathew stated that he had the authority to "overrule" Regional Anesthesia's decision. Chair Mathew then threatened Dr. Shaughnessy, stating that if Dr. Shaughnessy did not "create a divisive situation with the Department," then Chair Mathew would help him get the job. However, if Chair Mathew learned that Dr. Shaughnessy had been "bad-mouthing" him, he would make sure he did not get the job. Dr. Shaughnessy understood that these threats were directed against his earlier complaints on behalf of female physicians and physicians with disabilities. Chair Mathew further admonished Dr. Shaughnessy that he would be harmed professionally if he spoke to anyone outside of that room about the nonrenewal of his contract or if Dr. Shaughnessy contacted an attorney.

48.     On or about January 18, 2017, Dr. Shaughnessy met with Chair Mathew alone in order to request that he reconsider his decision to not renew his employment contract. Dr. Shaughnessy discussed his treatment for depression and that his personal struggles were well known within the Department. Chair Mathew responded that Dr. Shaughnessy was being let go for "less than optimum professionalism," and that Dr. Shaughnessy's previous actions within the Department were regarded as "not being team-oriented," referring to Dr. Shaughnessy's objections to the way in which Dr. Jones was treated and the response to the Resident's death. Chair Mathew then referenced Dr. Jones, stating that her "illness" was driving her behavior, and that she had shown disrespect for authority and harmed the Department. Chair Mathew reiterated that he had been hearing negative things from Vice Chair Martin about Dr. Shaughnessy's "professionalism."

49.     Dr. Shaughnessy then told Chair Mathew that it appeared that his termination was because

15

of his complaints about Dr. Jones and the response to the Resident's death. Chair Mathew denied this, stating that Dr. Shaughnessy, "did not seem happy."

50.     Chair Mathew also opined about his disagreement with the Americans with Disabilities Act, complaining to Dr. Shaughnessy that the law was intended to assist people with physical limitations access buildings and now it was being misused for "other purposes," referring to its application to psychological disabilities.

51.     Chair Mathew then said Dr. Shaughnessy could resign to avoid the "spectre of termination" like Dr. Jones, and others had done. Dr. Shaughnessy stated that he refused to resign. Chair Mathew told Dr. Shaughnessy that he would reconsider the termination.

52.     Chair Matthew also told Dr. Shaughnessy that he would not allow him to pursue professional opportunities at the VA. Dr. Shaughnessy requested Chair Matthew's support for pursuing a position at the VA, but Chair Matthew refused, indicating that Duke cannot "arbitrarily" allow Dr. Shaughnessy to go to the VA, and that it may harm Duke financially.

53.     Similarly, Chair Matthew told Dr. Shaughnessy that Duke typically does not let its physicians obtain employment with UNC. However, Chair Matthew communicated that support for this position was contingent upon Dr. Shaughnessy's silence surrounding the reasoning for the decision not to renew his contract.

54.     Chair Mathew then said Dr. Shaughnessy could resign to avoid the "spectre of termination" like Dr. Jones and others had done. Dr. Shaughnessy stated that he refused to resign. Chair Mathew told Dr. Shaughnessy that he would reconsider the termination.

55.     Several days later, Chair Mathew stated that his decision to terminate Dr. Shaughnessy's contract would stand.

56.     On or about January 22, 2017, Dr. Shaughnessy contacted Dr. Ben Reese of the Duke

16

Office of Institutional Equity regarding his knowledge of a violation of Duke's discrimination and retaliation policies. An administrator from that office replied by email and referred Dr. Shaughnessy to the Faculty Ombuds as an avenue of assistance. Following a telephone conference with the Faculty Ombuds, on or about January 22, 2017, Dr. Shaughnessy officially appealed Chair Mathew's non-renewal of his faculty appointment within Duke's internal grievance process under the Faculty Handbook. As of the date of this Complaint, these efforts have been unavailing to Dr. Shaughnessy and his contract was not renewed.

57.     On or about February 28, 2017, after receiving numerous emails, text messages, and conversations expressing an intent to hire him, Dr. Shaughnessy was suddenly told by the President of Regional Anesthesia, PPLC, Dr. Edward Sanders, that he did not think a job was available and he was concerned that Dr. Shaughnessy would not be a "good fit" at Duke Regional based upon what was going on at Duke. Dr. Sanders admitted to having spoken with Chair Mathew and Vice Chair Martin and others about Dr. Shaughnessy. Upon information and belief, Chair Mathew and Duke prevented Dr. Shaughnessy's attainment of the job with Duke Regional.

58.     Because of Dr. Shaughnessy's terminated contract with Duke, he was not permitted to remain employed by PDC, could no longer be a doctor at Duke, and was denied his profit-sharing bonus known as "gain share."

59.     Prior to Dr. Shaughnessy's complaints about the Department's conduct regarding the Resident and Dr. Jones, Chair Mathew had renewed Dr. Shaughnessy's contract with Duke on July 1, 2014, July 1, 2015 and July 1, 2016.

60.     Prior to Dr. Shaughnessy's complaints about the Department's conduct regarding the Resident and Dr. Jones, Chair Mathew rendered a positive evaluation of Dr. Shaughnessy's job

17

performance in May 2016, in addition to positive evaluations in 2014 and 2015.

61.   Because of the retaliation and discrimination against Dr. Shaughnessy, he has incurred lost wages, benefits, and has experienced emotional distress. Moreover, his professional reputation has been greatly damaged.

62.   On or about June 7, 2017, Dr. Shaughnessy filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), Charge No. 433-2017-02262, alleging that Duke had discriminated against him on the basis of disability and had retaliated against his complaints of sex discrimination and disability discrimination.

63.   As of June 30, 2017, Dr. Shaughnessy's employment with Duke ended.

64.   On or about February 26, 2018, the EEOC issued a Notice of Right to Sue ("NRTS"), attached hereto as **Exhibit A**, entitling Dr. Shaughnessy to bring this present action within ninety (90) days of receipt of the NRTS.

**FIRST CAUSE OF ACTION**
**Discrimination under the ADA & ADAAA**

65.   The foregoing allegations of this Complaint are incorporated by reference as if fully set forth herein.

66.   Plaintiff filed a timely charge with the EEOC alleging violations of the ADA and the ADAAA by Duke. On or about February 26, 2018, the EEOC issued its NRTS entitling Dr. Shaughnessy to bring suit on his claims under the ADA and ADAAA. All conditions precedent to this lawsuit have been fulfilled.

67.   At all times relevant herein, Dr. Shaughnessy was and is "disabled," within the ADAAA in that regarding his congenital heart block, depression, and rosacea, (1) Dr. Shaughnessy had a physical or mental impairment that substantially limited one or more major life activities; (2)

18

Dr. Shaughnessy had a record of such impairment; and/or (3) Dr. Shaughnessy was regarded as having such an impairment.

68.     Duke regarded Dr. Shaughnessy's disabilities as substantially limiting him in major life activities of the operation of a major bodily function and discriminated against him as such in violation of the ADA.

69.     Duke discriminated against Dr. Shaughnessy by terminating his employment on the basis of Dr. Shaughnessy's disability, by blocking his future employment prospects, and refusing to pay him the full amount of his gain share.

70.     At the time of Dr. Shaughnessy's discharge, he was performing his job at a level that met his employer's legitimate expectations.

71.     The effect of these unlawful practices has been to deprive Plaintiff of equal employment opportunities, and to otherwise adversely affect his employment status as an employee because of his disability.

72.     Duke had no legitimate non-discriminatory reason for its adverse employment action against Dr. Shaughnessy.

73.     Upon information and belief, the acts as alleged herein were committed against Dr. Shaughnessy with malice or reckless indifference to the Dr. Shaughnessy's protected rights.

<u>**SECOND CAUSE OF ACTION**</u>
**Hostile Work Environment Based on Disability**

74.     Dr. Shaughnessy incorporates by reference the foregoing paragraphs as if fully set forth herein.

75.     42 U.S.C. § 12112(a) provides that is an unlawful employment practice for an employer to, "discriminate against a qualified individual with a disability because of the disability of

19

such individual in regard to . . . other terms, conditions, and privileges of employment."

76.     At all times relevant herein, Dr. Shaughnessy was and is "disabled," within the ADAAA in that regarding his congenital heart block, depression, and rosacea, (1) Dr. Shaughnessy had a physical or mental impairment that substantially limited one or more major life activities; (2) Dr. Shaughnessy had a record of such impairments; and/or (3) Dr. Shaughnessy was regarded as having such impairments.

77.     Dr. Shaughnessy was subjected to unwelcome harassment based upon his disability.

78.     The complained-of harassment was sufficiently pervasive or severe to alter the terms, conditions, and privileges of his employment.

79.     The foregoing harassment is attributable to and was caused by the acts of the employer, Duke.

80.     Duke has engaged in discriminatory practices with malice or reckless indifference to Shaughnessy's federally protected rights, thereby entitling him to punitive damages pursuant to 42 U.S.C. § 1981a.

## THIRD CAUSE OF ACTION
### Retaliation in Violation of ADA & ADAAA

81.     Dr. Shaughnessy incorporates by reference the foregoing paragraphs as if fully set forth herein.

82.     At all times relevant herein, Dr. Shaughnessy was and is "disabled," within the ADAAA in that regarding his congenital heart block, depression, and rosacea, (1) Dr. Shaughnessy had a physical or mental impairment that substantially limited one or more major life activities; (2) Dr. Shaughnessy had a record of such impairments; and/or (3) Dr. Shaughnessy was regarded as having such impairments.

20

83.     Dr. Shaughnessy engaged in protected activity under the ADA and ADAAA by complaining to Chair Mathew and others about the ongoing discrimination and harassment on the basis of disability at Duke.

84.     Following Dr. Shaughnessy's protected activity, his employment contract was not renewed by Duke, his employment opportunity at Duke Regional was eliminated by Duke, and his gain share was reduced in December 2016, and eliminated for June 2017, in retaliation against his protected activity.

85.     The adverse employment action taken by Duke was because of, and in response to, Dr. Shaughnessy's complaints of harassment and discrimination on the basis of disability.

86.     Duke's actions have caused Dr. Shaughnessy to suffer mental and emotional distress, entitling him to compensatory damages pursuant to 42 U.S.C. § 1981a.

87.     Duke's discriminatory conduct, in violation of ADA and ADAAA, has caused Plaintiff to suffer loss of pay, benefits, and prestige.

88.     Duke has engaged in discriminatory practices with malice or reckless indifference to Dr. Shaughnessy's federally protected rights, thereby entitling him to punitive damages pursuant to 42 U.S.C. § 1981a.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of Title VII of the Civil Rights Act of 1964

89.     Dr. Shaughnessy incorporates by reference the foregoing paragraphs as if fully set forth herein.

90.     Dr. Shaughnessy engaged in protected activity under 42 U.S.C. §2000e-3, by complaining to Chair Mathew and others, as described herein, about the discrimination and harassment on the basis of sex perpetrated against female physicians in Duke's Anesthesiology Department.

21

91.     Following Dr. Shaughnessy's protected activity, his employment contract was not renewed by Duke, his employment opportunity at Duke Regional was eliminated by Duke, and his gain share was reduced in December 2016, and eliminated for June 2017, in retaliation against his protected activity.

92.     The adverse employment actions taken by Duke was because of, and in response to, Dr. Shaughnessy's complaints of harassment and discrimination based on sex.

93.     Duke's actions have caused Dr. Shaughnessy to suffer mental and emotional distress, entitling him to compensatory damages pursuant to 42 U.S.C. § 1981a.

94.     Duke's discriminatory conduct, in violation of Title VII, has caused Dr. Shaughnessy to suffer loss of pay, benefits, and prestige.

95.     Duke has engaged in discriminatory practices with malice or reckless indifference to Dr. Shaughnessy's federally protected rights, thereby entitling him to punitive damages pursuant to 42 U.S.C. § 1981a.

### FIFTH CAUSE OF ACTION
### Wrongful Discharge in Violation of North Carolina Public Policy

96.     The foregoing allegations of this Complaint are incorporated by reference as if fully set forth herein.

97.     Duke's termination of Dr. Shaughnessy's employment was for unlawful reasons and purposes that contravene North Carolina public policy. Namely:

(a) Discrimination on the basis of disability as set forth in the NCPDPA, N.C. Gen. Stat 168A-1 *et seq*.  Dr. Shaughnessy is protected under public policy against disability discrimination in that he is a disabled individual. Dr. Shaughnessy (1) has an impairment that significantly affects his ability to perform major life activities; (2) has a record of such

22

an impairment; and/or (3) was regarded by Duke as having such an impairment.  Duke discriminated against Dr. Shaughnessy in violation of public policy by terminating him because he was a disabled individual, had a record of a disability, and/or was regarded by Duke as disabled.

(b) Discrimination on the basis of disability as set forth in the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.1, *et seq*.  Dr. Shaughnessy is protected under public policy against disability discrimination in that he is a disabled individual. Dr. Shaughnessy (1) has an impairment that significantly affects his ability to perform major life activities; (2) has a record of such an impairment; and/or (3) was regarded by Duke as having such an impairment.  Duke discriminated against Dr. Shaughnessy in violation of public policy by terminating him because he was a disabled individual, had a record of a disability, and/or was regarded by Duke as disabled.

98.    Duke's actions in discharging Dr. Shaughnessy were taken with malice or with reckless indifference to Dr. Shaughnessy's rights.

99.    As a result of Dr. Shaughnessy's wrongful discharge, he has suffered emotional distress, economic damages, and damage to his reputation, inter alia.

100.    Dr. Shaughnessy is entitled to back pay, front pay, compensatory and punitive damages, and such other relief as the court shall deem proper.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF PRAYS:

1. That Plaintiff recover of Defendants compensatory damages in an amount to be determined by the trier of fact;

2. That Plaintiff recovers punitive damages of the Defendants in an amount calculated to

23

punish Defendants and deter similar future conduct;

3. That Plaintiff recover from the Defendants reasonable costs and expenses, including attorney fees, in bringing this action;

4. That all matters so triable be tried before a jury; and

5.  For such other and further relief as to the Court seems just and proper.


This the 29th day of May, 2018.

**Kornbluth Ginsberg Law Group, P.A.**

/s/ Michael A. Kornbluth
Michael A. Kornbluth
N.C. Bar No. 27928
Email: mkornbluth@KGLawNC.com
Andrew J. Henson
N.C. State Bar No. 49266
Email: ahenson@KGLawNC.com
3100 Tower Blvd., Suite 800
Durham, NC 27707
Telephone:     (919) 401-4100
Facsimile:     (919) 401-4104

24