Ogletree
Deakins

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

*Attorneys at Law*

4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Telephone: 919.787.9700
Facsimile: 919.783.9412
www.ogletreedeakins.com

Kimberly J. Lehman
(919) 789-3183
Kim.Lehman@OgletreeDeakins.com

January 16, 2018[1]

**CONFIDENTIAL**

**Via Digital Charge System Upload**
Ms. Johnnie M. Barrett
Senior Federal Investigator
U.S. E.E.O.C. – Raleigh Area Office
434 Fayetteville Street, Suite 700
Raleigh, NC 27601-1701

|  |  |  |
|---|---|---|
| Re: | Charge No.: | 433-2017-02262 |
|  | Charging Party: | Dr. Michael Shaughnessy |
|  | Respondent: | Duke University |

Dear Ms. Barrett:

Please accept Respondent Duke University's response to your email of September 18, 2017, requesting additional information regarding the above-referenced charge.

## I. Charging Party's "Rebuttal" Underscores His Inability to Establish Discrimination or Retaliation.

Charging Party's "rebuttal" is rife with irrelevant and unsubstantiated contentions. Indeed, the weakness of his claims is only further demonstrated by Charging Party's regurgitation of his unpersuasive arguments. Never did Charging Party raise any complaints of sex or disability discrimination. Never did Charging Party request an accommodation other than for his pacemaker, which accommodation was willingly provided. And never did Charging Party engage in protected activity within the meaning of the ADA and/or Title VII. Charging Party cannot establish discrimination or retaliation.

While Duke is again hamstrung by Charging Party's failure to provide specific statements by Dr. Mathew (or anyone else) that he contends evidence discriminatory animus or provide details of any of his own alleged statements he contends constituted "protected activity," Duke,

---

[1] Respondent initially attempted to upload this response on November 15, 2017. However, at that time, the EEOC Portal indicated "This charge is closed" and would not accept uploads. This status listing was apparently erroneous.

Atlanta • Austin • Birmingham • Boston • Charleston • Charlotte • Chicago • Cleveland • Columbia • Dallas • Denver • Detroit Metro • Greensboro • Greenville
Houston • Indianapolis • Jackson • Kansas City • Las Vegas • Los Angeles • Memphis • Miami • Minneapolis • Morristown • Nashville • New Orleans • New York City
Orange County • Philadelphia • Phoenix • Pittsburgh • Portland • Raleigh • St. Louis • St. Thomas • San Antonio • San Francisco • Stamford • Tampa • Torrance • Tucson • Washington

in a good faith effort to assist the Commission's investigation, responds with additional information that further demonstrates Charging Party's claims have no merit.

## II. Response to Request For Information

### A. Duke Denies That Dr. Mathew Regarded Charging Party as Disabled within the Meaning of the ADA

Charging Party purports to provide "two examples of how the principal decision maker, Chair of the Anesthesiology Department Joseph Mathew, regarded him as disabled." First, Charging Party contends Mathew told him he was "often unhappy" and that in response Charging Party "informed Mathew that he had depression and that he might appear unhappy because of his depression." Second, Charging Party alleges that Dr. Mathew brought up a complaint from a nurse that Charging Party's face was red, which is a symptom of his alleged rosacea.

> **RESPONSE**: Dr. Mathew did not regard Charging Party as disabled. Dr. Mathew vehemently denies that Charging Party ever mentioned alleged depression to him or that he had any knowledge of Charging Party's alleged depression prior to the meeting notifying Charging Party of his non-renewal. Any allegation by Charging Party to the contrary is false. As indicated in Duke's position statement, during the January 6, 2017 meeting attended by Dr. Mathew, Dr. Gadsden, and Dr. Martin informing Charging Party that his contract would not be renewed, Dr. Gadsden commented to the effect of "you don't appear happy here" in relation to Charging Party's non-engagement with the department mission. Dr. Mathew may have agreed with Dr. Gadsden in this respect based on his knowledge of Charging Party's lack of engagement in academics, poor teaching feedback, and documented rude behavior, though no comment of "often unhappy" by Dr. Mathew is recalled by Dr. Mathew, Dr. Martin, or Dr. Gadsden. It was at this time that Charging Party first mentioned his alleged depression when, in response to Dr. Gadsden, he stated words to the effect of "you should be careful with your choice of phrase, I have depression." Prior to this disclosure, Dr. Mathew had no knowledge of, and no reason to believe, that Charging Party suffered from depression.
>
> Regarding rosacea, Dr. Mathew had no knowledge of Charging Party's condition prior to receipt of the instant Charge. Dr. Mathew does not recall any complaint by a nurse regarding Charging Party's "red face" or any conversation with Charging Party about any such complaint.[2]

---

[2] There were instances wherein Charging Party was counseled by Dr. Martin for berating staff and trainees. It is possible that Charging Party's face did get red when he was yelling at staff and was, therefore, noted by staff. Importantly, it would not be readily apparent that the redness would be a symptom of rosacea as opposed to temperament.

Dr. Mathew had no knowledge of Charging Party's pacemaker prior to receipt of the instant Charge. Dr. Mathew played no role in scheduling and, thus, would not have a reason to be aware that Charging Party was exempt from cases in the MRI suite.

### B. Duke Denies That Dr. Martin or Dr. Gadsden Regarded Charging Party as Disabled within the Meaning of the ADA

Charging Party contends that he had "very close personal interactions with Vice Chair Gavin Martin and Division Chief Jeffrey Gadsden for many years such that they were aware of his having a pacemaker, his depression, and his rosacea. For Duke to allege otherwise is simply incorrect."

**RESPONSE:** Regarding rosacea, Duke reiterates that this condition would have absolutely no bearing on Charging Party's ability to perform his job, nor does Charging Party allege that it necessitated an accommodation. Nevertheless, Dr. Martin believes that Charging Party may have mentioned rosacea in passing as being one of the reasons he wore facial hair. Like Dr. Mathew, Dr. Gadsden had no knowledge of Charging Party's rosacea prior to the instant Charge.

Regarding the pacemaker, as previously stated, Duke informally accommodated Charging Party. Dr. Martin's recollection is that Charging Party notified him and the previous Vice Chair Holly Muir about his pacemaker around the time that the new MRI suite opened, roughly three years ago. For obvious reasons, it was agreed that Charging Party would not be scheduled for cases in the MRI suite. This was not an issue. Charging Party was not part of the group that provides anesthesiology for neurology cases (the type of cases that would typically utilize MRI). Moreover, there was plenty of staff to cover any such needs. Duke admits that Charging Party was slow in relieving colleagues and would arrive late for work, but those issues had nothing whatsoever to do with Charging Party's non-assignment to MRI cases. Any contention to the contrary is false.

Finally, with regard to Charging Party's alleged depression, as previously stated, the first time Charging Party ever mentioned his alleged depression to Dr. Gadsden and Dr. Martin was during the meeting informing Charging Party of his non-renewal. Charging Party's allegation that knowledge of his alleged depression must be imputed to Dr. Gadsden and Dr. Martin based on "close personal interactions" is baseless and only serves to underscore the meritless nature of Charging Party's claim. Charging Party's self-serving assumption is unpersuasive. Neither Dr. Gadsden nor Dr. Martin had any discussions with Charging Party regarding alleged depression. Nor did they have any reason to initiate any such conversations based on their observations of Charging Party.

### C. Duke Denies That Charging Party Engaged in Protected Activity

#### 1. Charging Party did not advocate or request an accommodation for a disabled female physician

Charging Party baldly alleges that he "supported disabled female physicians within the department when they were being reprimanded and belittled, and requested accommodations for a disabled female physician who was on medical leave. Charging Party further assets that Dr. Mathew's "response shows his retaliation" because of Charging Party's support of these individuals.

> **RESPONSE**: Tellingly, Charging Party again fails to identify any comments he contends constituted "reprimands" or were "belittling" concerning females with a disability. Moreover, Charging Party fails to identify any of his own alleged statements that would constitute protected activity within the meaning of the ADA or Title VII. Nevertheless, Duke will attempt to provide additional information to assist the Commission with promptly concluding that Charging Party's claim has no merit.
>
> As noted in Duke's position statement, a second year resident committed suicide in June of 2016. Dr. Mathew addressed the incident and did his utmost to treat the situation with respect and in accordance with the wishes of her family. During one of the initial meetings making faculty aware of the situation, Dr. Cheryl Jones spoke up and voluntarily shared her own experience with depression. Her candor was appreciated and warmly received.
>
> Subsequently, Dr. Jones brought in copies of a book that was a compilation of physician suicide letters. Dr. Jones had placed copies in one of the physician workrooms. Dr. Jones sought to have the department reimburse her for the books by charging the expense to her faculty discretionary account. Dr. Mathew consulted with Dr. Cathy Kuhn, the Director of Graduate Medical Education and DIO (Designated Institutional Official) for Duke University Hospital and the Health System and other department leaders regarding the request. Because of the sensitive nature of the material, a determination was made that the department would not purchase the books and the copies that were out in the workroom were placed on the shelf by Dr. Jones' division chief, Dr. Habib.
>
> While Dr. Mathew was traveling out of the country, Dr. Sol Aronson, Executive Vice Chair, Strategy & Finance for the department met with Dr. Jones and relayed that the department would not pay for the books and did not think it was appropriate that they be distributed. Dr. Jones stormed out of the meeting. Dr. Mathew was not aware of Dr. Aronson's intention to meet with Dr. Jones, though it was not outside of the scope of Dr. Aronson's position to do so.
>
> Following the meeting, Dr. Jones sent a blast email to the department expressing her disagreement with the decision. A copy is attached as **Exhibit 1**. Dr. Jones also reached

out to the book's author who posted on her blog that the book had been "banned" by a university. Importantly, Dr. Mathew in no way reprimanded or took any adverse action against Dr. Jones for the email. Indeed, the department took steps to provide support to Dr. Jones who had clearly been impacted by the recent events. Dr. Holly Muir, who was Dr. Jones' mentor, spoke with her. Dr. Muir encouraged Dr. Jones to take some time away in the interest of Dr. Jones' well-being. Dr. Jones agreed and took a leave of absence. The department fully supported Dr. Jones taking time she needed.

During a division meeting in October 2016, Dr. Mathew noted that Dr. Jones was on leave. He did not provide details as doing so would not have been appropriate. Charging Party and others expressed disagreement with way in which Dr. Aronson handled the situation with Dr. Jones. Charging Party asked what Dr. Mathew was "going to do about Sol." Dr. Mathew stated that he had an appropriate conversation Dr. Aronson. Some, including Charging Party appeared to believe that stronger disciplinary action was warranted. Dr. Mathew listened to the feedback and considered it an appropriate forum for the faculty to voice their opinions.

Charging Party asked about Dr. Jones' return and Dr. Mathew said he did not know if she would want to do so in light of her email demonstrating her discontent. However, that decision was up to Dr. Jones. Dr. Jones was welcome to return, but she chose to resign and stay on leave throughout her notice period. At no time did Dr. Mathew indicate that Dr. Jones was not welcome to return. Significantly, Charging Party did not "request an accommodation" for Dr. Jones. Duke's provision of leave to Dr. Jones had nothing whatsoever to do with Charging Party.

### 2. Charging Party did not object to alleged discrimination against females

Charging Party contends that he "objected to discrimination against females and against the disabled."

**RESPONSE**: Duke has already addressed the utter baselessness of Charging Party's contention that he allegedly advocated on behalf Dr. Jones, the resident who committed suicide, or anyone else with an alleged disability. Similarly, the Charge provides zero evidence of any discriminatory comments, statements, or actions by Dr. Mathew (or anyone else) remotely indicative of discrimination based on sex.

During his tenure as Department Chair, Dr. Mathew has recruited and promoted females. Examples include: (i) appointment of a female as Chief of Critical Care Division; (ii) recruitment and appointment of a female to the newly created position of Vice Chair for Performance and Operations; (iii) appointment of a female as the Director of Pre-Admission Testing; and (iv) appointment of a female as the Anesthesia Director of the Eye Center.

To the extent Charging Party's affidavit (which Duke has not seen) contains allegations concerning discussions held by the search committee concerning Dr. Mathew, not only are these allegations entirely irrelevant to the instant Charge, it is noteworthy that out of four finalists, including a female, the search committee only recommended Dr. Mathew for the position.

Charging Party references Marcy Tucker. This is another red herring. Dr. Tucker, who worked in a different division of the anesthesiology department than Charging Party, disagreed with her division chief's position regarding her scheduling requests (all Friday, Mondays, and spring break off). Dr. Tucker chose to leave. Dr. Mathew's only involvement was to recognize that scheduling decisions are within the purview of the division chief.

Regarding Dr. Holly Muir, as previously indicated, Dr. Muir took an opportunity to become the Department Chair at the University of Southern California. The department supported her in her transition to this new role.

Finally, Charging Party points to no valid evidence that males received preferential treatment. All faculty members have a discretionary account that may be utilized for purchases within the scope of the department's work and which expenditures must be pre-approved. Dr. Jones' request for reimbursement for the physician suicide letter books was discussed, considered, and ultimately denied because department leadership determined it was not appropriate under the circumstances. This was not a unilateral decision by Dr. Mathew and, more importantly, the decision had nothing whatsoever to do with Dr. Jones' sex.

Charging Party's contention that Dr. Jones was prevented from meeting with residents is simply untrue. Department leadership was aware of multiple group meetings for residents, which they viewed as positive. There were no efforts to prevent Dr. Jones or anyone else from meeting.

### D. Duke Denies Discrimination or Retaliation

#### 1. Dr. Martin and Dr. Gadsden did not have conversations with Charging Party concerning any alleged advocacy for the disabled or females

Charging Party contends that Dr. Martin and Dr. Gadsden told him that "he should not be outspoken against Dr. Mathew with regard to Cheryl Jones, the resident who committed suicide, or any other matter."

**RESPONSE**: These allegations are patently false. Dr. Martin and Dr. Gadsden had no conversations with Charging Party concerning Dr. Jones or the physician who committed suicide. Indeed, they did not (and had no reason to) view Charging Party as being outspoken with regard to Dr. Jones or the resident who committed suicide.

Charging Party was outspoken about his desire that an exception be made to allow him to receive his "gain share" bonus if he took a position with another Duke affiliated anesthesiology team, but this was a disagreement with a policy, not Dr. Mathew or any other individual.

### 2. Dr. Martin and Dr. Gadsden did not witness an alleged conversation wherein Dr. Mathew compared Charging Party to others

Charging Party contends that Dr. Martin and Dr. Gadsden witnessed a conversation where Dr. Mathew "spoke specifically about Charging Party's disability and referenced Dr. Kassik and the situation with Dr. Jones."

**RESPONSE**: This allegation is categorically denied. No such conversation occurred.

### 3. Charging Party's allegation regarding Dr. Mathew's alleged comments concerning the ADA is false

Charging Party alleges that Dr. Mathew stated that the "Americans with Disabilities Act was primarily intended for those with physical limitations and was now being misused for other purposes."

**RESPONSE**: This allegation is false. Dr. Mathew has previously stated his understanding that courts have ruled that mental disabilities, in addition to physical disabilities, are covered under the ADA. Charging Party's contention that Dr. Mathew placed this in a negative light or insinuated that this constitutes a "misuse" is simply a fabrication.

### 4. Others whose contracts were not renewed

In response to this request, Duke states that there are no other physicians in Charging Party's former department whose contracts were non-renewed during Dr. Mathews' tenure as Chair.

### III. The Charge Should Be Dismissed

Charging Party's rebuttal is simply more smoke and mirrors, false statements, and a blatant after-the-fact attempt to try to create a discrimination/retaliation claim where none exists. Dr. Shaughnessy's claims should be dismissed and the Commission should issue a "no cause" determination.

Thank you for your attention to this matter. Please contact me directly should you have further questions.

Ogletree
Deakins

Sincerely,

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

Kimberly J. Lehman

KJL/kjl
Encl.