IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MICHAEL SHAUGHNESSY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18-CV-461 |
| | ) | |
| DUKE UNIVERSITY, PRIVATE | ) | |
| DIAGNOSTIC CLINIC, PLLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

Dr. Michael Shaughnessy, formerly an anesthesiologist at Duke University, sued Duke and the Private Diagnostic Clinic, PLLC (PDC). The evidence creates disputed questions of material fact as to Dr. Shaughnessy's claims for discrimination in violation of the Americans with Disabilities Act, breach of contract by failing to renew his faculty appointment, and tortious interference, and those claims will proceed to trial. Otherwise, summary judgment will be granted to the defendants.

## FACTS

To the extent the facts are disputed, the Court states the evidence in this section in the light most favorable to the plaintiff, since the defendants move for summary judgment on all claims. Additional evidence is included later during discussion of specific claims, especially on those claims where Dr. Shaughnessy also moves for summary judgment and the evidence must be viewed in the light most favorable to the defendant in evaluating his motions.

In 2011, Duke hired Dr. Shaughnessy as an anesthesiologist to do clinical work at the University hospital and, to a lesser degree, to conduct academic research and supervise residents. That same year, he became a member of PDC, the limited liability company made up of Duke doctors and the vehicle through which those doctors provide clinical services, including to patients outside the hospital.

In early June 2016, a resident physician in the Anesthesiology Department committed suicide. Some anesthesiologists advocated for Department leadership to take a more active role in supporting the mental health of other residents. One of those physicians, Dr. C.J., discussed her own struggles with depression at two faculty meetings. After running into obstacles and intimidation from Department Chair Dr. Joseph Mathew and physically aggressive intimidation by Vice-Chair Dr. Sol Aronson, Dr. C.J. went on medical leave around August 8, 2016.

Another anesthesiology resident, Dr. L.J., also spoke out in the Department to raise awareness of suicide prevention and actively supported Dr. C.J.'s efforts. Dr. L.J. received negative feedback and indirect threats of retaliation made by Dr. Mathew expressed to third persons. As a result of this and of observing how Dr. C.J. was treated, Dr. L.J. stopped her efforts to support suicide prevention awareness and told Dr. C.J. the reason was fear of retaliation.

Around the same time, Dr. Shaughnessy complained to his faculty mentor Dr. Richard Moon, his then-division chief Dr. Tim Miller, and the Department Vice-Chair for clinical operations Dr. Gavin Martin about how Dr. C.J. was mistreated by Dr. Aronson

and about Dr. Mathew's behavior and hostility to those with depression, specifically to Dr. C.J.  He told the three doctors that he struggled with depression himself.

Despite efforts by three doctors to address the Anesthesiology Department's treatment of people with depression and to support the mental health of residents, the situation did not improve.  Instead, at an October division meeting, around the time Dr. C.J. gave her six months' notice, Dr. Mathew publicly downplayed the seriousness of the resident's suicide, inaccurately dismissing it as the action of someone who had a drug problem and had diverted drugs.  He also instructed physicians to provide this information to incoming residency applicants who asked about the suicide.  Dr. Shaughnessy again spoke up, objecting to the insensitive characterization of the resident, referring to his struggles with depression, and suggesting that Dr. Aronson should be disciplined for his aggressive and threatening behavior towards Dr. C.J.  In a later conversation with Dr. Shaughnessy, Dr. Mathew blamed Dr. C.J. for being "wrong" and said she "should have known better."

At around the same time, Dr. Shaughnessy sought a transfer from the Duke Hospital Anesthesiology Department to the Community Division, also known as Regional Anesthesia, which serviced contracts at multiple clinics outside the hospital. Department leadership supported this transition because it would suit Dr. Shaughnessy's strengths as a clinician and not require him to do the resident training and academic research that they perceived as his weaknesses.  Dr. Eddie Sanders, chief of the Community Division, started the credentialing process to hire Dr. Shaughnessy.

3

When Dr. Shaughnessy spoke to then-division chief Dr. Jeffrey Gadsden and to Dr. Martin in November 2016 about working in the Community Division, Dr. Martin and Dr. Gadsden told him he might be "blacklisted" from various local hospitals as a result of his complaints to and about Dr. Mathew. Dr. Gadsden later privately told Dr. Shaughnessy to "watch his back" for the same reasons. A few weeks later, Dr. Shaughnessy learned that his "gain share" payment for the second half of 2016 would be substantially lower than usual and that he would not be paid the gain share at all for January to June 2017 if he were to go to the Community Division in June 2017.

Dr. Mathew decided not to renew Dr. Shaughnessy's annual contract with Duke, and he notified Dr. Shaughnessy on January 6, 2017. In that conversation, Dr. Mathew explicitly conditioned his support for Dr. Shaughnessy's future employment prospects on Dr. Shaughnessy's cessation of his efforts to effect change in the department.

Through the fall and winter, Dr. Shaughnessy stayed in touch with Dr. Sanders during the credentialing process for the job in the Community Division. In late February, Dr. Sanders told Dr. Shaughnessy there was no position available with the Community Division, and even if there were, he would not hire Dr. Shaughnessy for it. This was the first time in at least 15 years that a candidate for a position at Regional Anesthesia was not hired after going through the credentialing process. Dr. Shaughnessy's position at Duke and his relationship with the PDC both ended in June 2017.

## CLAIMS

Dr. Shaughnessy asserts both state and federal law claims against Duke and the PDC. *See* Doc. 19. Pending against Duke are Dr. Shaughnessy's claims for:

- Breach of contract, Doc. 19 at ¶¶ 124–27,
- Discrimination against him in violation of the Americans with Disabilities Act as amended, by terminating him, blocking future employment prospects, and refusing to pay him compensation he was owed, *id.* at ¶¶ 88–96; by creating a hostile work environment, *id.* at ¶¶ 97–103; and by retaliating against him for engaging in activities protected by the ADA. *Id.* at ¶¶ 104–11.
- Discrimination against him in violation of Title VII by retaliating against him for engaging in activities protected by Title VII. *Id.* at ¶¶ 112–18.
- Wrongful discharge in violation of public policy. *Id.* at ¶¶ 119–23.
- Tortious interference with prospective economic advantage. *Id.* at ¶¶ 128–34.
- Tortious interference with contract. *Id.* at ¶¶ 135–40.

Pending against PDC is Dr. Shaughnessy's claim for tortious interference with prospective economic advantage. *Id.* at ¶¶ 128–34.[1]

Duke has moved for summary judgment on all claims against it. PDC has moved for summary judgment on both claims against it; PDC had previously moved for judgment on the pleadings, Doc. 93, as to Dr. Shaughnessy's wrongful discharge claim, Doc. 19 at ¶¶ 119–23, and this motion has been addressed by separate order. Doc. 137. Dr. Shaughnessy has moved for summary judgment on his breach of contract claim

---

[1] In the operative complaint, Dr. Shaughnessy does not specifically say that his tortious interference with prospective economic advantage claim is against both Duke and PDC, and the allegations appear to be directed only against Duke. *See* Doc. 19 at ¶¶ 128–34. But PDC has moved for summary judgment on this claim, Docs. 113, 118, and Dr. Shaughnessy has responded in opposition. Doc. 122.

5

against Duke and on Duke's affirmative defense to the ADA discharge claim of after-acquired evidence.

## DISCUSSION

### I. Claims Against Duke

#### a. Discrimination in violation of the ADA

Dr. Shaughnessy claims Duke violated the ADA by terminating him, blocking future employment prospects, reducing his "gain share" payment, creating a hostile work environment, and retaliating against him for engaging in protected activities. Duke admits that Dr. Shaughnessy is disabled as defined by the ADA as a result of his depression, but it challenges virtually every other element of this cause of action.

The evidence, viewed as a whole in the light most favorable to Dr. Shaughnessy, supports his claim that Duke discriminated against him based on his depression and his efforts to advocate for other physicians with depression and potential mental health issues. That evidence shows a culture of dismissive, harassing, and intimidating responses by the department chair Dr. Mathew, vice-chairs Dr. Aronson and Dr. Martin, and others in leadership roles to physicians who admitted to suffering from depression or who raised concerns about whether the Anesthesiology Department responded appropriately to the mental health issues implicated by a resident's suicide. One physician was harassed to a degree that caused her to take medical leave, and another physician experienced negative feedback and gossip originating from the chairs or vice-chairs. After disclosing his own depression and complaining about the Department's response to those with depression, Dr. Shaughnessy was harassed, had his gain share

6

reduced, and then was terminated; eventually, his superiors obstructed his efforts to take another job when he would not back down from his complaints.

Duke has presented evidence about Dr. Shaughnessy's performance, his treatment of staff and residents, and his conduct leading up to the January 2017 non-renewal, which it says explains the non-renewal and Dr. Shaughnessy's reduced December 2016 payment on other, non-discriminatory grounds. But Duke's evidence is disputed by Dr. Shaughnessy's evidence, and as to his non-renewal, Duke's performance-based defense is inconsistent with statements made at the time that the decision to end his contract was not for cause. The evidence gives rise to disputed questions of material fact for the jury.

Duke's motion for summary judgment on Dr. Shaughnessy's ADA discrimination claims based on his depression and advocacy for others experiencing or vulnerable to mental health issues will be denied.

To the extent the ADA claim is based on Dr. Shaughnessy's heart block or rosacea, the motion will be granted. There is no evidence he experienced any discrimination based on the rosacea, and he does not dispute that Duke accommodated the heart block.

### b. Discrimination in violation of Title VII

Dr. Shaughnessy asserts a retaliation claim under Title VII. While he cites a few Title VII cases in his brief, *see* Doc. 121 at 20–22, he does not identify which facts apply to this claim, as distinct from his retaliation claim under the ADA, nor does he explain how he experienced discrimination based on sex. *See id.* at 3–12, 20–22. The Court will grant Duke's motion for summary judgment as to this claim.

7

### c. Breach of contract

Dr. Shaughnessy contends that Duke breached their contract when it terminated him without cause in violation of promises made in the offer letter and promises made in the faculty handbook. Both Duke and Dr. Shaughnessy move for summary judgment on this claim.

It is undisputed that in the operative offer letter, dated April 13, 2011, Duke offered Dr. Shaughnessy employment as a faculty member and assistant professor in the Department of Anesthesiology, which Dr. Shaughnessy accepted by signing the offer letter. Doc. 111-3; Doc. 19 at ¶¶ 7, 12; Doc. 28 at ¶¶ 7, 12.[2] The "Standard Terms and Conditions" appended to the offer letter state the faculty appointment "will be renewed on a continuing annual basis, subject to satisfactory annual performance and programmatic needs." Doc. 111-3 at 5. The Terms and Conditions also provide that, "[a]s a full-time University employee, you will be subject to all applicable University policies, as they may exist from time to time, including" conflicts of interest; patents and tangible research property; the Faculty Handbook; and the School of Medicine policies. *Id.* at 5–6.

When Dr. Shaughnessy received the offer letter, he emailed then-Department Chair Dr. Mark Newman with several questions about the PDC's non-compete provisions. Doc. 111-5 at 2–3. In response, Dr. Newman wrote that "[t]he PDC agreement is the overarching agreement as is the faculty handbook." *Id.* at 1; *see* Doc.

---

[2] Dr. Shaughnessy made minor revisions to the letter agreement to terms not relevant to the present motion.

8

111-3 at 2 (noting Dr. Shaughnessy would "need to execute the PDC Operating Agreement and related documents"). After the Board of Trustees approved Dr. Shaughnessy's position as assistant professor, he received a letter stating he would "continue to receive all rights, privileges and benefits afforded members of the faculty." Doc. 111-8.

Dr. Shaughnessy's annual renewal letters each noted that, in addition to the Conditions of Appointment,

> You may also wish to review Appendix C of the Faculty Handbook which includes the University's policy on Academic Freedom and Academic Tenure and the University's obligations in the event of notification of termination . . . Please remember that all appointments with modifying descriptors and all secondary appointments are annual appointments and, therefore, [for the term starting July 1, 2016] will expire on June 30, 2017, unless noted otherwise below. Advance notice of intent not to renew an appointment must be given as described in the Faculty Handbook.

Doc. 111-9 at 5 (letters identical in relevant part except for the employment dates). The letter then indicates Dr. Shaughnessy would be an "Assistant Professor – Track IV of Anesthesiology 7/1/2016 – 6/30/2017." *Id.*

There are disputed questions of material fact as to whether Duke breached the provision in the contract that Dr. Shaughnessy's contract would be renewed annually if his performance was satisfactory. During the termination conversation, Dr. Martin described the non-renewal as "a no cause termination of your contract," Doc. 121-3 at 5 (8:9–10), thus indicating that Dr. Shaughnessy's performance was satisfactory. And, as discussed *supra*, there is significant evidence that Dr. Shaughnessy was terminated for an improper and non-performance-related reason: discrimination in violation of the ADA.

9

But there is also evidence that Duke decided not to renew his contract for performance-related issues.  Given these questions of fact, Duke's and Dr. Shaughnessy's cross-motions for summary judgment will be denied as to this aspect of the breach of contract claim.

Dr. Shaughnessy also bases his breach of contract claim on two promises made in Duke's Faculty Handbook, Appendix C:  1) academic freedom, including a faculty member's ability "[t]o act and to speak in his or her capacity as a citizen without institutional censorship or discipline," Doc. 111-10 at 1, and 2) certain procedural requirements applicable to decisions by Duke not to renew non-tenure-track faculty.  *Id.* at 7–10; *see* Doc. 111 at 5–9.

"[T]he law of North Carolina is clear that unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it," *Walker v. Westinghouse Electric Corp.*, 77 N.C. App. 253, 259, 335 S.E.2d 79, 83–84 (1985), and this rule applies to agreements between professors and universities.  *Black v. W. Carolina Univ.*, 109 N.C. App. 209, 213, 426 S.E.2d 733, 736 (1993).  A university's policies "cannot be the basis of a breach of contract claim unless the . . . policy provision is a specific, enforceable promise that is incorporated into the terms of a contract" between the university and its employee.  *McFadyen v. Duke Univ.*, 786 F. Supp. 2d 887, 982 (M.D.N.C. 2011) (collecting cases), *aff'd in part and rev'd in part on other grounds sub nom. Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012); *Ryan v. Univ. of N.C. Hosps.*, 128 N.C. App. 300, 302, 494 S.E.2d 789, 791 (1998) (plaintiff "must point to an identifiable contractual promise that the [defendant] failed to honor").

For example, in *Black v. Western Carolina University,* the North Carolina Court of Appeals found that an offer letter stating that the employee's appointment "is subject to the WCU Tenure Policies and Regulations as found in the Faculty Handbook" did incorporate the handbook into the contract. *Black,* 109 N.C. App. at 210, 426 S.E.2d at 734. Likewise, in *Mayo v. North Carolina State University,* the same court held that language in the appointment letter that the plaintiff's "employment is subject to all policies adopted and amended by the UNC Board of Governors" incorporated those policies into the contract. 168 N.C. App. 503, 508–09 & n.2, 608 S.E.2d 116, 121 (2005).

Here, the terms of the Faculty Handbook that Dr. Shaughnessy invokes for his breach of contract claim were not expressly incorporated into a separately existing employment contract. *See Black*, 109 N.C. App. at 213, 426 S.E.2d at 736. His renewal letters refer to the part of Appendix C of the Handbook on how and when a faculty member will be notified of termination or a contract that is not renewed, *see* Doc. 111-9 at 5, and describe it as an "obligation" of the university, *id.*, but there is no claim here that this provision was breached. The renewal letters do not reference the Handbook's provisions setting forth how Duke will decide not to renew a faculty member's contract. And they do not characterize the Handbook's academic freedom provisions as obligations or promises; instead, the letters characterize these provisions as a "policy." *Id.* These facts are quite different from those in *Black* and *Mayo*, where the appointment letters specifically stated that the professor's employment was "subject to" the policies at issue.

11

Duke is entitled to summary judgment to the extent Dr. Shaughnessy's breach of contract claim is based on the Faculty Handbook.

### d. Wrongful discharge in violation of North Carolina public policy.

Duke moves for summary judgment on Dr. Shaughnessy's wrongful discharge claim, Doc. 110 at 18–19, a claim that is only available to at-will employees. Dr. Shaughnessy does not oppose dismissal of this claim. Doc. 121 at 23. Duke's motion for summary judgment on the wrongful discharge claim will be granted.

### e. Tortious interference with prospective economic advantage and with contract

Duke moves for summary judgment on these claims, bundling these two tortious interference claims into one paragraph of its brief. It does not, as required by the Local Rules, identify the elements for either claim. *See* LR 56.1(e) (requiring movant to "set out the elements that the claimant must prove (with citations to supporting authority)"). It provides only one factual citation in support of dismissing both claims, *see* Doc. 110 at 24 (citing Doc. 109-13 at ¶ 10), and it does not explain why the evidence is insufficient to support a jury verdict on any particular element or elements. *See Beverage Sys. of the Carolinas, LLC v. Assoc. Beverage Repair, LLC*, 368 N.C. 693, 700–701, 784 S.E.2d 457, 462–63 (2016) (citing distinct elements for each tort).

Duke has not met its initial burden to show that it is entitled to summary judgment on these claims. *See* Fed. R. Civ. P. 56(c). Duke's motion will be denied as to both the tortious interference with contract and tortious interference with prospective economic advantage claims.

### f. Duke's defense to ADA claim of after-acquired evidence

In its Answer, Duke asserted that "after-acquired evidence" served as a bar to Dr. Shaughnessy's "recovery of damages and other legal or equitable relief." Doc. 23 at 23. Dr. Shaughnessy moves for summary judgment as to this defense. While not completely clear from the Answer or the briefing, based on the cases the parties cite, it appears this defense is directed only towards the ADA failure-to-renew claim.

In order to prevail on an after-acquired evidence defense, an employer must prove that (1) the employee was guilty of severe misconduct or wrongdoing; (2) the employer was unaware of his conduct; and (3) the employer would have decided not to renew the employee's contract on those grounds alone if the employer had known of the alleged misconduct at the relevant time. *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362–63 (1995). It is not sufficient for the employer to believe that the employee had engaged in misconduct. *See Miller v. AT&T Corp.*, 250 F.3d 820, 838 (4th Cir. 2001) (defendant did not establish after-acquired evidence defense when it showed only that it believed an employee's absences were not covered under the FMLA, rather than showing employee was not actually entitled to FMLA leave).

The only evidence Duke offers in support of its after-acquired evidence defense is testimony from Dr. Martin about out-of-court statements made by others some three years after Dr. Shaughnessy left Duke. According to Dr. Martin, "other faculty members" told him that Dr. Shaughnessy "was out drinking late at night on many occasions and was deemed drunk by his colleagues but yet still came to work the next day." Doc. 111-43 at 3 (82:12–22), 13 (95:8–25). Dr. Martin identified only one person,

13

Dr. D., as the source of this information, which was non-specific as to date, number of occasions, or surrounding circumstances. *Id.*

Duke has not provided any admissible evidence to prove that Dr. Shaughnessy came to work the day after drinking enough alcohol to become drunk. Statements by Dr. D. or others to Dr. Martin are obviously hearsay, and Duke has not explained how they could be sufficient to prove the truth of these court-of-court statements. *See id.* at 3 (82:12–16) (noting these allegations were not "documented"). Duke asserts that this hearsay is admissible to explain Dr. Martin's reaction to this information, rather than to prove the conduct itself, Doc. 126 at 21 n.5, but it cites no case for the proposition that the after-acquired evidence defense can apply based on hearsay or on uncorroborated, uninvestigated gossip reported years after the fact.

The only case Duke cites has very different facts. In *Blackwell v. Publix Super Markets Inc.*, summary judgment was denied on the after-acquired evidence defense where it was undisputed that the employee had a prior criminal record, and the employer produced evidence that the employee had not disclosed this record in the employment application. No. 8:16-2992-HMH-KFM, 2018 WL 1010185, at *13–14 (D.S.C. Jan. 11, 2018) (finding defendant "submitted sufficient evidence to raise a genuine issue of material fact" on this defense based on several declarations and other record documents).

Dr. Shaughnessy's motion for summary judgment on Duke's defense of after-acquired evidence will be granted.

## II. Claims Against PDC

### a. Wrongful discharge in violation of public policy

The PDC has moved for judgment on the pleadings as to this claim, which has been decided by separate order. Doc. 137.

### b. Tortious interference with prospective economic advantage

To prevail on this claim, Dr. Shaughnessy must demonstrate that the PDC interfered with his future employment by maliciously inducing a third party, Regional Anesthesia, not to enter into a contract with him, which he would have entered into but for the interference; damage proximately ensued; and the interference was "not done in the legitimate exercise" of the PDC's rights. *Beverage Sys.*, 368 N.C. at 701, 784 S.E.2d at 463; *see Walker v. Sloan*, 137 N.C. App. 387, 392–93, 529 S.E.2d 236, 241 (2000) (noting action is based on "conduct by the defendants which prevents the plaintiff from entering into a contract with a third party"). The PDC moves for summary judgment on this claim, challenging the sufficiency of Dr. Shaughnessy's evidence on each element.

Most of the PDC's arguments have no merit and require no discussion. The plaintiff's evidence is that Dr. Mathew, acting on behalf of PDC and Duke, prevented Dr. Shaughnessy's move to Regional Anesthesia. Dr. Shaughnessy has offered evidence that he was on track to be hired by Regional Anesthesia until Dr. Mathew interfered, that in 15 years no physician-candidate who began the credentialing process at Regional Anesthesia had not been hired, that Dr. Mathew was motivated by a desire to retaliate against Dr. Shaughnessy based on his protected status and his protected conduct under the ADA, and that absent that interference, he would have been hired to work with Regional Anesthesia.

15

PDC's contention that Dr. Shaughnessy cannot succeed in proving that Regional Anesthesia is not a third party, however, has merit. As noted *supra*, to succeed on this claim, Dr. Shaughnessy must prove that the PDC induced a third party not to enter into a contract with Dr. Shaughnessy. *DaimlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002); *Walker*, 137 N.C. App. at 392–93, 529 S.E.2d at 241.

On the one hand, the undisputed evidence shows that PDC and Regional Anesthesia are separate legal entities: the PDC is a PLLC, and Regional Anesthesia is a separate PLLC. Doc. 115-1. Indeed, the two entities have a contractual relationship with each other. *Id.* But on the other hand, that same contract provides that Regional Anesthesia will not itself employ any physicians, *id.* at § 3.5; Docs. 115-2, -3, -4, and that the PDC has full responsibility to perform all personnel and staffing operations for Regional Anesthesia. Doc. 115-1 at § 3.5. While there is abundant confusing and contradictory evidence about why this arrangement arose, what the two entities said about the arrangement, and how it was understood by Dr. Shaughnessy, none of this evidence undermines the undisputed facts that Regional Anesthesia does not employ physicians directly and that all physicians who provide services through Regional Anesthesia work for PDC. It is undisputed that had he been hired, Dr. Shaughnessy would have worked for PDC, not Regional Anesthesia PLLC, and PDC cannot interfere in a potential employment relationship with itself.

The evidence, viewed in the light most favorable to Dr. Shaughnessy, establishes that Regional Anesthesia did not hire physicians and that PDC would have been the

16

hiring entity. The Court will grant the PDC's motion for summary judgment and will dismiss this claim against PDC.

## Conclusion

Dr. Shaughnessy's evidence, if believed, shows harassment, retaliation, and discrimination by Duke against physicians who had depression and who took actions in support of the mental health of other physicians and residents, including Dr. Shaughnessy. Questions of fact exist about why Duke did not renew Dr. Shaughnessy's contract, so the cross-motions for summary judgment as to breach of the "satisfactory performance" provision in the contract are denied. Duke has not shown it is entitled to summary judgment on the tortious interference claims. These claims will move to trial.

Dr. Shaughnessy's contract did not expressly incorporate the due process and academic freedom provisions in the Faculty Handbook. Duke's motion for summary judgment is granted and Dr. Shaughnessy's motion is denied as to the breach of contract claim based on the Faculty Handbook provisions. Duke's motion will also be granted as to Dr. Shaughnessy's Title VII claim and his wrongful discharge claim.

Dr. Shaughnessy's motion for partial summary judgment on the after-acquired evidence-of-misconduct defense will be granted. Duke has not proffered evidence sufficient to establish a disputed question of material fact as to this defense.

The evidence viewed in the light most favorable to Dr. Shaughnessy establishes that Regional Anesthesia was not the hiring entity and that PDC was not a third party to the prospective contract. The PDC's motion for summary judgment is granted as to the tortious interference with prospective economic advantage claim.

It is **ORDERED** that:

1. The motion for summary judgment by the Private Diagnostic Clinic, Doc. 113, is **GRANTED** as to the tortious interference with prospective economic advantage claim and that claim is **DISMISSED**.

2. Duke University's motion for summary judgment, Doc. 109, is **DENIED** as to the plaintiff's claims under the ADA arising out of his depression and acts in support of others with depression, his breach of contract claim arising out of the "satisfactory performance" term, the tortious interference with prospective economic advantage claim, and the tortious interference with contract claim.

3. Duke University's motion for summary judgment, Doc. 109, is otherwise **GRANTED** and the plaintiff's ADA claim based on rosacea and heart block disabilities, his breach of contract claim based on the due process and academic freedom provisions in the Faculty Handbook, his Title VII claim, and his wrongful discharge claim are **DISMISSED**.

4. Dr. Shaughnessy's motion for partial summary judgment on Duke's after-acquired evidence-of-misconduct defense, Doc. 108, is **GRANTED**.

5. Dr. Shaughnessy's motion for partial summary judgment on his breach of contract claim, Doc. 108, is **DENIED**.

This the 23rd day of July, 2020.

_____
UNITED STATES DISTRICT JUDGE